UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )    No. 03-10404-NG
    )
    )
    )
    v.    )
    )
2. RONALD CAVALIERE,    )
    )
    Defendant.    )

## **GOVERNMENT'S OPPOSITION TO MOTION TO SUPPRESS**

The United States of America, by and through its attorneys Michael J. Sullivan, United States Attorney for the District of Massachusetts, and Rachel E. Hershfang, Assistant U.S. Attorney, hereby opposes the motion to suppress evidence filed by Ronald Cavaliere ("Cavaliere").  In that motion, Cavaliere asks the Court to suppress all evidence seized during a search at his home, conducted pursuant to a state-issued search warrant, on April 19, 2002.  This motion should be denied.

Cavaliere's motion founders at the threshold, as he has not filed an affidavit in support of his motion to suppress, nor provided any factual citations for the claims he advances.  Under L.R. 7.1(B)(1), "[a]ffidavits and other documents setting forth or evidencing facts on which the motion is based *shall* be filed with the motion."  (emphasis added). See, e.g., United States v. Maxwell, 247 F. Supp.2d 25 (D. Mass. 2003) (defendant must file affidavit in support of motion).

1

Cavaliere suggests in a footnote that facts "are derived from police reports, a search warrant affidavit, and a previous suppression motion that was filed in the state court.]" Memorandum in Support of Defendant's Motion to Suppress Evidence ("Def. Memo.") 1, n.1.   He attaches no affidavit (or other record support) for arguments critical to his case.   Cavaliere says that witnesses *would* testify, at an evidentiary hearing, that the police did not knock and announce, Def. Memo. 6, but that does not get him a hearing.   Without a factual basis for the alleged "facts," Cavaliere is not entitled to a hearing.   United States v. Migely, 596 F.2d 511, 513 (1st Cir. 1979).[1].

This is not a purely academic objection.   This search has, as Cavaliere implies but does not state, already been the subject of a suppression hearing in state court.   Cavaliere lost the motion; a copy of the judge's memorandum and order is attached hereto as Exhibit 1.   There is sworn testimony on these subjects, which Cavaliere neither cites nor supplies.   See Exhibit 1 at 1-2 (defendant's mother-in-law and wife testified at suppression

---

[1] "Evidentiary hearings on motions under Fed.R.Crim.P. 41(e) are not granted as a matter of course; they are required only when a defendant makes a sufficient showing that a warrantless search has occurred.   The defendant must allege facts, 'sufficiently definite, specific, detailed, and nonconjectural, to enable the court to conclude that a substantial claim is presented.' [citation omitted] The factual allegations must be such that, if proved, would require the grant of relief, Grant v. United States, 282 F.2d 165, 170 (1960), and must be more than 'general and conclusory or based upon suspicion and conjecture.' [citations omitted]."

hearing).  If that testimony is consistent with his efforts here, it is properly the basis for his motion.  If it is inconsistent with his efforts here, at the very least, the Court should be made aware of the inconsistencies.

Without an affidavit, or any other factual basis for any one of the 4 ½ pages of facts submitted by Cavaliere, the government is left to hunt for record support for Cavaliere's arguments.  This is not what the rules contemplate, and it should not be allowed.  Combined with the failure to provide (or even refer to) earlier sworn testimony, this failure should doom Cavaliere's first claim, which relies on "facts" not in the record.  The remaining claims may be decided on the papers.

The government asks that Cavaliere be required to supplement his filing with factual support, in the form of affidavits and prior testimony, and with record citations to support the "Statement of Facts" in his memorandum.  The government respectfully requests the right to supplement its filing after such citations have been provided.

I.  **Facts**

The following facts were either established by the Search Warrant Affidavit and were therefore properly considered in issuing the search warrant for 9 Wildwood Drive, e.g., United States v. Nelson-Rodriguez, 319 F.3d 12, 33 (1st Cir. 2003)(probable cause is assessed based on the information provided in the four corners of the affidavit supporting the

warrant application); <u>United States v. Grant</u>, 218 F.3d 72, 75 (1st Cir. 2000)(same), or were found by a judge following a suppression hearing.

**A.    Drug investigation of Cavaliere.**

Cavaliere was investigated by the New Hampshire State Police, with the assistance of a cooperating witness.  (This person is referred to in the search warrant materials as "CI," so that nomenclature will be retained herein.)  Initially, the CI was discussing a sale of cocaine and marijuana to Cavaliere. Exhibit 2 (Application and Affidavit in Support of Application for a Search Warrant) ("Search Warrant Affidavit") ¶¶3-7.  The negotiations, which were captured on audio- and video-tape, showed Cavaliere to be a savvy and large-scale drug trafficker.

In a meeting on November 12, 2001, the CI gave Cavaliere a marijuana sample in furtherance of the investigation.  Search Warrant Affidavit ¶5.  Cavaliere and the CI met in the CI's (wired) car, under law-enforcement surveillance.  <u>Id</u>.  The discussed the quality of the marijuana the CI was to sell, and Cavaliere insisted that it be smoked so that he could assess the quality.  <u>Id</u>.  Cavaliere told the CI that he could move 500 pounds of marijuana in the initial transaction, and also talked about associates in the cocaine business.  <u>Id</u>.  According to Cavaliere, this organization could move 20 to 50 kilograms of cocaine a month, and he had seen more than six kilograms sold in a single day.  <u>Id</u>.  After the meeting, Cavaliere drove to his home

at 9 Wildwood Drive, Milford, Mass.  Id.

In a meeting on February 19, 2002, the CI again provided Cavaliere with drug samples -- this time, both cocaine and marijuana.  Search Warrant Affidavit ¶7.  (This meeting was also audio- and video-taped.)  The two talked about doing a 25-kilogram cocaine deal.  Id.  Cavaliere tasted the cocaine sample, in the CI's presence, and remarked that there was "milk sugar" in the drug.  Id.  At his home, Cavaliere said, he had a method of testing the cocaine to see how pure it was.  Id.  He also claimed to have a "cooker" that would separate out the pure cocaine from any other material it was mixed with.  Id.  Cavaliere bragged that he had been in the drug business for many years, and had been successful because he had "done it right."  Id.  He said he had recently received 1000 pounds of marijuana, and that he paid only $300 a pound for it (in Texas).  Id.

The two talked about a 25-kilogram cocaine deal, and also about a cocaine and marijuana deal.  Id.  When they discussed logistics, Cavaliere cautioned the CI not to go to a hotel, as "that's where the drug deals go down ... hotel rooms... Cops know this."  Id.  Cavaliere also discussed his finances, saying that he did not "put his money in the bank," and that he did not "show his money" -- presumably a reference to keeping quiet about his substantial drug profits.  Id.

After the meeting, Cavaliere returned to his home at 9 Wildwood Drive.  Id.

Cavaliere and the CI had further conversations in which they discussed a 300-pound marijuana deal, and Cavaliere offered to sell the CI marijuana for $750/pound.  Search Warrant Affidavit ¶8.  They agreed to do the deal on April 15, 2002.  Id.

On the appointed date, Cavaliere was playing golf, but reassured the CI that he could still deliver a marijuana sample. Search Warrant Affidavit ¶9.  Eventually, though, the two decided to skip the sample and go straight to the real deal.  Id. Cavaliere and the CI spoke on April 16, and Cavaliere reassured the CI that he had tried the marijuana, and that it was good. Id.  Cavaliere explained that his associate got off work at 3 p.m., and would then load the marijuana and deliver it to Cavaliere's home.  There, Cavaliere said, the marijuana would be loaded onto Cavaliere's truck, and he would bring it to meet the CI.  Id.

**B.   9 Wildwood Drive, Milford.**

The warrant described the home as follows:

> The property at 9 Wildwood Drive, Milford,
> Massachusetts is more particularly described as a large
> wood-framed dwelling in a Tudor style painted cream in
> color with brown trim.  The first level of the
> residence is constructed of tan brick which forms an
> archway over the front door.  The front door is solid
> wood and is brown in color.  To the right of the front
> entrance is located a black metal sign with white
> lettering which reads "Nine Wildwood Drive."  To the
> left of the front entrance is a two car enclosed
> garage.  Wildwood Drive is a dead end street and #9
> Wildwood Drive is the last residence on the right side
> of Wildwood Drive.

Search Warrant Affidavit 16-17.  The affiant, Massachusetts State

Police Trooper Timothy Babbin ("Trooper Babbin"), who did surveillance at the home on many occasions, further researched the home's ownership and status.  The electric company confirmed that there was only one account for electric service at the home, and that it was in Cavaliere's name.  Exhibit 1 at 14.  When the apartment was added to the home, it was done under a zoning provision that forbid an outwardly-visible change to the single-family appearance of the house.  Exhibit 1 at 14.  There is only one mailbox, and the entrance to the in-law apartment is off a breezeway that also provides an entrance to the house.  Exhibit 1 at 14-15.  The in-law apartment is not visible by looking at the building from public property.  Exhibit 1 at 15.

> **C.    Execution of the search warrant on April 17, 2002.**

On April 17, 2002, officers went to 9 Wildwood Drive in anticipation of the marijuana delivery.  They saw Frank Fister ("Fister") drive up in a Chevy Tahoe and park near the garage; he then turned the vehicle around and backed it up to the garage doors.  Exhibit 1 at 4.  Soon afterward, the CI arrived and Cavaliere showed him the marijuana in the Tahoe.  Id.  Cavaliere then left to get his money, and the police moved in.  Id.

During the approach, officers (including Trooper Babbin) walked by the Tahoe, which had a partly open window.  Id. at 4-5.  The troopers saw plastic trash bags, full, in the rear of the SUV, and smelled marijuana.  Id. at 5.  From there, they walked to a breezeway area, where there was a door on the right (at

7

ground level) and a set of exterior stairs that led up to a deck. Id. The officers divided forces and went to both doors. Id. At each, a trooper paused and yelled, "state police -- search warrant" several times. Id.

On the lower level, officers entered and discovered Cavaliere's mother-in-law sitting at a kitchen table. Id. They quickly checked the apartment for other people, then left. Id. Meanwhile, upstairs, the officers had encountered Cavaliere, his wife Deborah Cavaliere, and Frank Fister. Id. They proceeded to search the property, finding guns and ammunition, cocaine (in Deborah Cavaliere's purse and on Cavaliere's person), and marijuana (in the Tahoe). Id. at 5-6. Fister's briefcase, found on the Tahoe's front seat, also contained cocaine, as well as $9000 in cash, a checkbook, credit cards, and Fister's prescriptions. Id. at 6.

**II. Argument.**

    **A.   Officers properly entered Cavaliere's residence.**

Cavaliere claims that the officers who arrived to execute the warrant at his home failed to knock and announce their presence before then entered the premises. Def. Memo. 5-6. As noted above, the record is devoid of any factual support for this claim. If no factual support is tendered, the motion must be denied without a hearing. L.R. 7.1(B)(1); see Migely, 596 F.2d at 513.

Another judge who considered the same argument has found, as

8

a matter of fact, that the police did knock and announce before
entering Cavaliere's home.  Exhibit 1 at 5.  (Downstairs:
"Trooper Babbin stopped at the door, yelled 'state police --
search warrant' several times, and waited several seconds."
Upstairs: "Also announcing 'state police, search warrant' loudly,
several times [...].")

     As a general matter, when executing a search warrant, law
enforcement officers must announce their presence to possible
occupants of the residence to be search before attempting
forcible entry.  See United States v. Antrim, 389 F.3d 276, 279
(1st Cir. 2004); United States v. Sargent, 319 F.3d 4, 8 (1st
Cir. 2003).  In addition, the time between the required
announcement and the time that the officers executing the warrant
actually enter the premises must be "reasonable" under the
circumstances of the case.  Antrim, 389 F.3d at 279; see Wilson
v. Arkansas, 514 U.S. 927, 931 (1995) (discussing common-law
"knock and announce" requirement as part of the broader Fourth
Amendment reasonableness inquiry because "we have little doubt
that the Framers of the Fourth Amendment thought that the method
of an officer's entry into a dwelling was among the factors to be
considered in assessing the reasonableness of a search and
seizure").

     The common law knock-and-announce requirement serves three
related purposes:  (1) to protect the privacy interests of the
occupants in the residence; (2) to permit the occupants to

9

voluntarily respond to the announcement of entry, avoiding any damage that might be occasioned by a forcible entry; and (3) to inform the occupants that the people attempting entry are law enforcement officers, rather than unlawful intruders.  <u>Antrim</u>, 389 F.3d at 279.

Those interests were protected here.  Cavaliere asserts that the officers failed to knock and announce.  A court has found that they did, and denied a motion on the same basis.  Without evidence to support Cavaliere's claim, it must be denied.

> **B.    The search was justified by the warrant, as well as by the circumstances.**

Cavaliere takes issue with the scope of the search, arguing that it went beyond that justified by the warrant.  Def. Memo. 6-9.  As the basis for this claim, Cavaliere says that his wife, and her pocketbook, and Frank Fister and his briefcase and truck, were searched by the authorities, who were not authorized to do so.  <u>Id</u>. at 7.

This claim is, like the one before it, unsupported by any factual basis.  However, it may be addressed on purely legal grounds.

As Cavaliere appropriately recognizes, to have standing to assert a Fourth Amendment right, a defendant must himself have suffered a constitutional violation.  That is, Cavaliere must have had a subjective and reasonable expectation of privacy in the area searched if he is to challenge the search's propriety.

See, e.g., Robinson v. Kentucky, 448 U.S. 98, 104 (defendant has no standing to challenge admissibility of drugs seized from companion's purse). He claims that he had such an expectation here, because "the property searched was within the cartilage [sic] of 9 Wildwood Drive."[2]

This statement falls far short of what must be shown before Cavaliere is entitled to have the Court hear his claim. To assert a Fourth Amendment right, a defendant must show that he has a legitimate expectation of privacy in the area searched or item seized. See Rakas v. Illinois, 439 U.S. 128, 138-48 (1978); United States v. Sanchez, 943 F.2d 110, 112-13 (1st Cir. 1991). This requires Cavaliere to prove that he has "both a subjective expectation of privacy and that society accepts that expectation as objectively reasonable." United States v. Mancini, 8 F.3d

---

[2] Cavaliere's second basis for his assertion of standing is somewhat opaque. Cavaliere argues that "the Government has moved for forfeiture of defendant's assets, including the real property located at 9 Wildwood Drive, based in part on the allegation that the defendant possessed property to facilitate the commission of the crime with which he has been charged. By so charging, the Government has, in effect, acknowledged that the defendant had a privacy interest in the property that was searched." Def. Memo. 7.

The government's pending seizure of 9 Wildwood Drive is, of course, based on that property's relationship to Cavaliere's drug trafficking offenses -- the government contends that, whether based on its facilitation of the drug-trafficking offense (as most dramatically evidenced in the seizure of hundreds of pounds of marijuana), or as property constituting or derived from drug trafficking, the property is subject to forfeiture. See United States' Bill of Particulars for Forfeiture of Assets (docket no. 18). That the government seeks to forfeit 9 Wildwood Drive does not prove that Cavaliere had a privacy interest in, for example, Frank Fister's briefcase or Frank Fister's person.

104, 107 (1st Cir. 2001), <u>citing</u> <u>California v. Greenwood</u>, 486
U.S. 35, 39 (1988); <u>Katz v. United States</u>, 389 U.S. 347, 361
(1967) (Harlan, J. concurring).   Cavaliere must show that he
reasonably expects privacy in both the item seized and the place
searched.  <u>See</u> <u>United States v. Salvucci</u>, 448 U.S. 83, 93 (1980)
("[W]e must ... engage in a conscientious effort to apply the
Fourth Amendment by asking not merely whether the defendant had a
possessory interest in the items seized, but whether he had an
expectation of privacy in the area searched.") (internal
quotations omitted).

        Cavaliere has submitted nothing to support the inference
that he had such an expectation in Frank Fister's person or in
Fister's briefcase, which was located in Fister's vehicle.
Instead, Cavaliere simply claims that these items were on
Cavaliere's property.   This is a double-edged sword, since there
was a warrant to search Cavaliere's property.[3]

        This argument cannot be seriously entertained.   If Cavaliere
is correct, then he has the same reasonable expectation of
privacy in the contents of the letter-carrier's bag when that
person walks up the driveway to deliver his mail, or in the purse
of a dinner-guest of his wife's.   If Cavaliere had a Fourth
Amendment privacy right in these items, the Fourth Amendment

--------

        [3] Items seized from Deborah Cavaliere, her bag, Frank
Fister, and his briefcase, all fell within the scope of the
warrant.   <u>See</u> Exhibits 3 and 4 (Reports of Trooper Babbin).

would be so broad as to be meaningless.  See, United States v.
Haqq, 278 F.3d 44 (2d Cir. 2002) (vacating suppression of guns
found in suitcase in defendant's apartment where defendant had
borrowed housemate's suitcase, then returned it by putting it on
housemate's bed; defendant had no reasonable expectation of
privacy in suitcase).

Haqq is instructive.  In that case, the defendant was
arrested by police in his home, based on outstanding warrants.
Haqq, 278 F.3d at 45.  During a sweep of the house, the police
said that they saw a gun outlined through a suitcase on a bed.[4]
Id. at 45, 47.  The bed was in a room used by a man other than
the defendant.  Id. at 46.  The police opened the suitcase, found
three guns, and questioned Haqq, who admitted the guns were his.
Id. at 45-46.

The district court "held that the search of the suitcase
violated Haqq's reasonable expectation of privacy in his his
home.  Thus, the District Court, in essence, treated the search
of the suitcase in Haqq's home as a part of a search of his
home."  Id. at 48.  Thus, the appeals court ruled, was wrong,
because it failed to account for the fact that the suitcase did
not belong to Haqq and was not in his room.  The Court of Appeals
explicitly rejected the notion that, "in the context of a single
dwelling shared by several unrelated individuals, that each

---

[4] The district court found that this statement was not
credible, and it was not addressed on appeal.

13

automatically has a reasonable expectation of privacy in the
whole dwelling, so that each person's reasonable expectation of
privacy is violated when there is an impermissible search of an
object in the dwelling (but not the dwelling itself), regardless
of who owns the object or in whose room or space it is located
[...]." Id. at 50.  "To the contrary," the court went on, "when
considering the legality of a serach of an object within a home,
courts have properly focused on the defendant's expectation of
privacy in *the object* apart from his expectation of privacy in
the home."  Id. (citing cases); compare United States v. Garcia-
Rosa, 876 F.2d 209, 219 (1st Cir. 1989), vacated on other
grounds, 498 U.S. 954, aff'd, 930 F.2d 951 (1st Cir. 1991) (where
homeowner failed to assert his privacy right in contents of box
on wife's dresser in wife's bedroom, he had no such privacy
right).

If anyone's privacy rights were violated here -- and the
government does not concede they were -- it was Fister's and
Deborah Cavaliere's.  Neither of them is heard to complain;
indeed, each has been charged with offenses related to the
seizures on that day, and each has pled guilty to the offense.
Cavaliere lacks the requisite privacy interest to assert the
claims he brings here.  His motion must be denied.

**C.   The warrant was adequately supported by probable cause.**

Items found at Cavaliere's residence are admissible because
they were seized subject to a valid search warrant supported by

14

probable cause.  See, e.g., United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999), cert. denied, 528 U.S. 1119 (2000); United States v. Zayas-Diaz, 95 F.3d 105, 113 (1st Cir. 1996).  To establish probable cause, the government need only prove that the totality of the circumstances disclosed in the supporting affidavits demonstrate "a fair probability that the contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238.[5]  Accordingly, a warrant application must demonstrate probable cause to believe that: 1) a crime has been committed;  and 2) evidence of the offense will be found at the place to be searched.  Zayas-Diaz, 95 F.3d at 110-11;  Feliz, 182 F.3d at 86 ("[i]n order to establish probable cause, the facts presented to the magistrate need only 'warrant a man of reasonable caution' to believe that evidence of a crime will be found").  See also United States v. Vigeant, 176 F.3d

---

[5]  In Gates, 462 U.S. at 238 the Court described the role of the Magistrate Judge in deciding to issue a warrant as follows:

> [T]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

The government need not show the same quantum of proof as is necessary to convict the defendant.  See, e.g., United States v. Figueroa, 818 F.2d 1020, 1023 (1st Cir. 1987); United States v. Nocella, 849 F.2d 33, 39 (1st Cir. 1988).

565, 569 (1st Cir. 1999); <u>United States v. Khounsavanh</u>, 113 F.3d
279, 283 (1st Cir. 1997).

"[A] magistrate's determination of probable cause should be
paid great deference by reviewing courts." <u>Illinois v. Gates</u>,
462 U.S. 213, 236 (1983), <u>quoting</u> <u>Spinelli v. United States</u>, 393
U.S. 410, 419 (1969). Where, as here, a defendant challenges a
probable cause determination, the reviewing court should simply
ensure that the magistrate had a substantial basis for concluding
that probable cause existed. <u>See</u> <u>Feliz</u>, 182 F.3d at 86; <u>United
States v. Procopio</u>, 88 F.3d 21, 25 (1st Cir. 1996); <u>United States
v. Taylor</u>, 985 F.2d 3, 5 (1st Cir. 1993). Even in doubtful or
marginal cases, reviewing courts still defer to an issuing
magistrate's "probable cause" determination. <u>See</u> <u>United States
v. Ventresca</u>, 380 U.S. 102, 107 (1965); <u>Rosencranz v. United
States</u>, 356 F.2d 310, 316 (1st Cir. 1997) ("The Supreme Court
made it perfectly clear that . . . doubtful cases should be
resolved in favor of the warrant.")

Cavaliere argues that the information contained in the
Search Warrant Affidavit was inadequate to establish probable
cause to search. Def Memo. 9-11. Cavaliere admits that there
was plenty of evidence that he was involved in drug dealing, Def.
Memo. 9-10, but points instead to a supposed a lack of direct
evidence linking his drug dealing and his residence.

This argument ignores the substantial information set forth

16

in the Search Warrant Affidavit concerning Cavaliere's drug activity and 9 Wildwood Drive.  As set forth above, the facts presented to the magistrate judge need only "warrant a man of reasonable caution" to believe that evidence of a crime will be found at the place to be searched.  <u>Texas v. Brown</u>, 460 U.S. 730, 742 (1983); <u>Felix</u>, 182 F.3d at 86.  There is no requirement that the belief must be absolutely correct.  <u>See</u> <u>Spinelli</u>, 393 U.S. at 419; <u>Felix</u>, 182 F.3d at 86.

The totality of the circumstances described in the Search Warrant Affidavit plainly established the likely presence of incriminating evidence of Cavaliere's drug trafficking at his home.  <u>See</u> <u>Felix</u>, 182 F.3d at 86.  As Cavaliere admits, the affidavit provides ample fodder from which to conclude that he was a drug dealer.  <u>E.g.</u>, Search Warrant Affidavit ¶4 (Cavaliere and CI discussed Cavaliere's desire to purchase 500 pounds of marijuana and 20 kilograms of cocaine); ¶5 (CI provided Cavaliere with a sample of marijuana in anticipation of 500 pound deal; Cavaliere said he would have to smoke it to analyze it); <u>id</u>. (Cavaliere said he was involved in organization tha moved 20 to 50 kilograms of cocaine per month); ¶7 (CI and Cavaliere discuss Cavaliere's marijuana business and possible 25 kilogram cocaine deal; Cavaliere takes cocaine and marijuana samples and tastes cocaine); ¶8 (more discussion of cocaine and marijuana transaction; Cavaliere offers to sell marijuana for $750/pound).

17

All of this, Cavaliere argues, does not lead inexorably to the conclusion that there would be drugs or contraband in his house.  In this, he is wrong.  The Search Warrant Affidavit provides ample facts from which the issuing court could conclude that there was "a fair probability that the contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238.

On November 12, 2001, in an audio- and video-taped meeting, the CI met with Cavaliere and provided him with a marijuana sample.  Search Warrant Affidavit ¶5.  The two discussed a significant drug deal.  Id.  Cavaliere was then followed back to his home at 9 Wildwood Drive, where he went into his home.  Id.

On February 19, 2002, the CI and Cavaliere had another recorded meeting to talk about their drug deal.  Search Warrant Affidavit ¶7.  The CI provided Cavaliere with samples of both cocaine and marijuana.  Id.  Cavaliere told the CI that he "had a method of testing the cocaine, *at his residence*, that would reveal its purity."  Id.  Cavaliere also added that he had a "cooker" to separate the pure cocaine from any dilutents.  Id. In discussing the logistics of the proposed deal, Cavaliere cautioned the CI against doing it in a hotel, since "that's how everybody gets popped."  Id.

During the same meeting, Cavaliere and the CI talked about money.  Cavaliere told the CI that he doesn't "put his money in

18

the bank." _Id_.

After this meeting, as after the earlier meeting, Cavaliere took his drug samples directly back to his home at 9 Wildwood Drive. _Id_.

On April 12, 2001, the planned deal became concrete: Cavaliere was to sell the CI 300 pounds of marijuana for $750/pound. Search Warrant Affidavit ¶8. The two planned to meet on April 15 so that Cavaliere could provide the CI with a sample. _Id_.

On April 15, the date set for the deal, Cavaliere and the CI talked, and they agreed that the sample would change hands later in the day; however, Cavaliere later begged off, saying he had hurt his back on the golf course. Search Warrant Affidavit ¶9. The two agreed to meet the next day. _Id_. Cavaliere told the CI that he had sampled the marijuana and that it was very good. _Id_. He described the plan as follows: after 3:00 p.m., his associate would load the marijuana and bring it to Cavaliere's home, where the marijuana would be loaded into Cavaliere's truck. _Id_. The two were then going to meet in New Hampshire to do the deal. _Id_.

Trooper Babbin drew on his nine years as a State Trooper, including his years in the Narcotics and Special Investigations Division at the Attorney General's Office, and his specialized training (described more fully in the Search Warrant Affidavit, ¶1) to describe items that he would customarily expect to find

when doing a drug investigation.  Drug dealers, in his
experience, "frequently maintain written records of the drugs
bought and sold, the identities of the persons who have purchased
or sold the drugs, and the moneys due to, or owed by, them."
Search Warrant Affidavit ¶B (p. 12).  In addition, drug
distributors "often maintain books, records, receipts, invoices,
notes, ledgers, money orders, bank records and other papers
relating to their transportation, ordering, sale and distribution
of controlled substances." Id. ¶C.  These items are often stored
"in their residences" or the residences of people involved with
them, as well as in other secure areas to which the drug dealers
have access, Trooper Babbin explained.  Id. ¶D.

    These facts are sufficient to support the issuing
magistrate's "substantial basis for concluding that probable
cause existed." See Feliz, 182 F.3d at 86.  Cavaliere was
followed from drug deals directly to his residence on two
occasions.  He talked about having significant amounts of cash,
but not keeping it in a bank.  He told the CI that he kept a
cocaine-testing apparatus at his home, and tested cocaine (a
preliminary, less-scientific test, presumably) in the CI's
presence.  Cavaliere also indicated that he had a device to
distill cocaine; although he did not say it was in his home, this
is a logical inference, as he had indicated that he kept other
cocaine-related paraphernalia there.  And, in setting up the

20

deal, Cavaliere indicated that the marijuana would be transferred to his custody at his home.

These facts are more than sufficient to support the issuance of the warrant.  The motion should be denied.

> **D.   The search warrant described the premises to be searched with adequate particularity; the search was limited to what the warrant authorized.**

Cavaliere's final argument is that the search warrant was defective in its failure particularly to describe the premises to be searched.  Def. Memo. 12-13.  This lack of particularity, which Cavaliere claims led to the unlawful search of the "second residence" (an in-law apartment in which Cavaliere's mother-in-law was living), should be fatal to the warrant, he claims.  Id.

To meet the Fourth Amendment's particularity requirement, a search warrant must allow the officers who execute it to "with reasonable effort ascertain and identify the place intended." Steele v. United States, 267 U.S. 498, 503 (1925).  In considering whether a warrant is sufficiently particular, a court may rely on personal knowledge to identify the place that should be searched.  United States v. Strother, 318 F.3d 64, 69-70 (1st Cir. 2003) (warrant sufficiently particular, despite failure to identify specific apartment number, where reliable informant identified first floor as defendant's residence and U.S. Postal Service confirmed defendant lived in building).

Here, Trooper Babbin had conducted surveillance at the

building in the past.  He knew that Cavaliere lived there, and

that electric company records showed only one account, in

Cavaliere's name.  He had seen Cavaliere coming and going through

the breezeway that provided access, it turned out, both to

Cavaliere's home and to his mother-in-law's apartment.  The

searching officers knew where they were going -- 9 Wildwood Drive

-- and what they were looking for (Cavaliere in his home).  As

soon as it became apparent that the in-law apartment was not what

they were looking for, they left.  Nothing was seized from the

apartment, and it was not searched.[6]  See Exhibit 1, 5.

    In support of his motion, Cavaliere cites Maryland v.

Garrison, 480 U.S. 79 (1987).  In that case, a warrant issued for

the third-floor apartment in a building.  Id. at 80.  When the

warrant issued, the police "reasonably believed" that the

described premises were only one apartment.  Id.  They conducted

their search of what turned out to be two apartments, found

contraband in the one they had not known existed, and charged its

inhabitant (Garrison) with a crime.  Id.  There, as here, the

exterior of the building did not give away the number of units

inside; an inquiry of the utility company did nothing to dispel

---

    [6] What Cavaliere describes as a "search" of the in-law
apartment is more appropriately characterized as a protective
sweep.  Such a sweep, limited to a quick check of areas in which
a person could be hiding, is appropriate when law-enforcement
officers fear for their safety on entering a suspect property.
Maryland v. Buie, 494 U.S. 325 (1990).

the officers' reasonable belief that only one residence was involved; and cooperator information indicated that there was only one unit.  Id. at 81.

The Supreme Court determined that the warrant was valid when issued, id. at 86; the question presented was whether, in executing the warrant, the police violated *Garrison*'s constitutional rights -- that is, the rights of the owner of the property for which there was no warrant.  Id.  The parallel question here would be whether the search violated Cavaliere's mother-in-law's rights, a question that is not before the Court.

The search did not violate Garrison's rights, the Supreme Court ruled, because the officers reasonably executed the warrant according to what they believed it authorized, and as soon as they realized that Garrison's apartment was separate from Webb's, which they had intended to search, they stopped searching it. Id. at 88-89.  As the Court recognized, "While the purposes justifying a police search strictly limit the permissible extent of the search, the Court has also recognized the need to allow some latitude for honest mistakes that are made by officers in the dangerous and difficult process of making arrests and executing search warrants."  Id. at 87.

Here, as in Garrison, any mistake was honest.  Furthermore, the person affected (Cavaliere's mother-in-law) asserts no constitutional violation.  The good-faith failure to identify the

23

house as a two-family property was promptly cured -- as soon as the officers realized they were in a separate apartment, occupied by someone other than Cavaliere, they left.  Nothing was seized, so there is nothing to suppress.  The motion should be denied.

### CONCLUSION

Based on the facts and argument set forth above and filed herewith, as well as any presented at a hearing on this matter, the government submits that Griffin's motions should be denied. The government further submits that there is no need for an evidentiary hearing on these motions.

                                   Respectfully submitted,

                                   MICHAEL J. SULLIVAN
                                   United States Attorney

                              By:
                                   /s/ Rachel E. Hershfang
                                   RACHEL E. HERSHFANG
                                   Assistant U.S. Attorney

Dated: February 23, 2006

### CERTIFICATE OF SERVICE

This is to certify that I have this day served upon counsel of record the foregoing by filing it electronically this 23rd day of February, 2006.

                                   /s/ Rachel E. Hershfang
                                   RACHEL E. HERSHFANG
                                   ASSISTANT UNITED STATES ATTORNEY

24