COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.                                                 SUPERIOR COURT
                                                               CRIM ACTION
                                                               No. 02-0790(1-12)

COMMONWEALTH OF MASSACHUSETTS

vs.

RONALD CAVALIERE

MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

February 10, 2003

The defendant is charged by indictment with trafficking and conspiracy to traffick in marijuana, and ten weapons violations. He has moved to suppress evidence obtained by police as a result of a search of his residence located at 9 Wildwood Drive, Milford, Massachusetts. He contends that a search warrant was issued without a proper showing of probable cause, that although some information included in the affidavit filed as part of the application for the warrant may have resulted from intercepted communications properly obtained by New Hampshire police following the one-party consent law of that jurisdiction, the use of such evidence in Massachusetts was not authorized and was improperly included, that there was an insufficient showing that evidence sought would be located at his residence, that the residence described in the warrant was inaccurate, that police violated knock and announce rules and that persons present and persons and a motor vehicle located on the property were neither described in the warrant nor properly searched.

An evidentiary hearing was conducted on January 21, 2003, at which testified Trooper Timothy Babbin of the Massachusetts State Police and Sergeant Michael Hambrook of the New Hampshire State Police; also testifying for the defendant were Catherine Dobay and Debra

Cavaliere, the mother-in-law and wife of the defendant, respectively. The motion was then taken under advisement

On April 16, 2002, a search warrant was issued for 9 Wildwood Drive, Milford, Massachusetts, upon the application of Trooper Babbin of the Massachusetts State Police. This application generally reported that a narcotics investigation had begun in New Hampshire at some time prior to November, 2001. In November, Sgt. Hambrook of the New Hampshire State Police contacted the narcotics unit attached to the Massachusetts Office of the Attorney General, informing them that the investigation was leading them to a Massachusetts resident, the defendant herein, and their assistance was being invited to further their investigation in light of Massachusetts activities. Sgt. Hambrook informed the narcotics officers, Trooper Timothy Babbin among them, that he had obtained information, through a confidential, known and previously relied upon informant, that the defendant had expressed a willingness to make a large-scale purchase of marijuana (500 pounds) and cocaine (20 kilograms). Believing that this information presented an opportunity for the operation of a "reverse sting," the informant began assisting the New Hampshire State Police by agreeing to consent to and participate in communications with the defendant that would be monitored by Sgt. Hambrook, both telephonic and in-person, by means of a "body-wire" concealed on the informant for purposes of audio eavesdropping, and by videography for both audio and video recording. A number of such communication events then occurred over the next several months, leading to April 15, 2002. During that span of time, the defendant asked for and received from the informant samples of both marijuana and cocaine, the first occasion being November 12, 2001, when the defendant

2

arrived in New Hampshire as a passenger in a motor vehicle driven by another. After providing a sample of marijuana to the defendant, police then followed him in the vehicle to his home at 9 Wildwood Dr., Milford. A second such meeting between the CI and the defendant occurred on February 20, 2002, in Manchester, New Hampshire, and it had been arranged in order that the defendant obtain a sample of cocaine. During this meeting, the defendant told the informant that he had the means for purity testing of the drugs at his home. The defendant also told the informant during these conversations, and overheard by the New Hampshire police, that he is involved in a large scale operation and has been for a long time, that he did not keep his money in banks, and that he could not "show his money." The defendant had also told the informant that although he has several connections to obtain narcotics, he was interested in acquiring any that the informant could provide. The defendant was again followed from this meeting directly to his home. Later that same day, the defendant contacted the informant and told him that the cocaine tested well and that he wanted to proceed with a 25 kilogram purchase.

Cavaliere later reported to the informant that he was not able to obtain the funds to complete the cocaine buy. On April 12, 2002, the informant called the defendant to discuss a possible 300 pound marijuana purchase by the informant. The defendant stated to the CI that "his guy" would have it available by April 15th, at which time the defendant could provide the informant with a sample; if acceptable, the transaction could be completed later the same day or the next. These law enforcement officers and others took up surveillance positions at the defendant's home on April 15, 2002. The informant and the defendant spoke several times that day and the defendant told him that he had hurt his back playing golf, that the transaction could not go forward that day

3

but that he and his associate could bring the marijuana to the CI in New Hampshire on April 16th

On April 16th, Trooper Babbin of the Massachusetts State Police then sought a search warrant for the defendant's residence, intending to execute it in connection with the defendant's delivery of marijuana to the informant in New Hampshire. The warrant sought currency, paraphernalia and instrumentalities of the defendant's narcotics business, including scales, packaging materials and documentary evidence of the defendant's sources of drugs, customers, storage, finances, and the identities of persons in possession of the premises.

The transaction scheduled to occur on April 16, 2002, in New Hampshire, did not go forward, due, according to the defendant's conversation with the informant, to Cavaliere's continuing back trouble. On April 17th, the defendant and the informant made arrangements for the CI to take delivery of the marijuana at the defendant's house. On the 17th, officers again took up surveillance positions around the defendant's home. At approximately 3:45 p.m., they observed one Frank Fister drive a Chevrolet Tahoe onto the defendant's driveway and park near the garage. The defendant's wife came out of the home first, followed by the defendant and they greeted Fister. After conversation with the defendant, Fister then turned the SUV around and backed the vehicle up to the garage doors. Cavaliere then notified the informant that the drugs were there. The CI arrived at the premises soon thereafter. Cavaliere opened the rear doors of the Tahoe and showed the marijuana, contained in plastic bags, to the informant. Telling the defendant that he was then going to get his money man, he left and the combined state police warrant execution team arrived.

As the police pulled their vehicle into the driveway, in front of the Tahoe, and while exiting

4

the vehicle to approach the house, several officers, including Babbin and Hambrook, went by the Tahoe, the drivers door window being partly down. Although the rear windows of the Tahoe were tinted, the front were not and the troopers were able to see inside, observing a number of filled plastic trash bags in the rear. They also smelled an odor of marijuana emanating from the Tahoe.

The officers then went to an area of an open breeze way, observing a door on their right at ground level, and a set of exterior stairs up to a deck. Some officers went to each. Among the first officers that approached doors to the residence, Trooper Babbin stopped at the door, yelled "state police-search warrant" several times, and waited several seconds. Hearing nothing, this closed but unlocked screen door was opened and they stepped inside a kitchen to what they then observed to be an in-law apartment occupied by Catherine Dobay, Debra Cavaliere's 74 year old mother, who was then seated at the kitchen table. After officers checked the apartment for other persons, they left. While that team of officers were making entry through that ground level entrance, Sgt. Hambrook and other officers had climbed the stairs to the deck and observed the defendant and Frank Fister in the room immediately in from the deck, namely, the kitchen. Also announcing "state police, search warrant" loudly, several times, and observing the defendant and Fister suddenly stand up from seated positions at the kitchen table and quickly leave that room. The officers entered and secured all persons present: the defendant, having quickly gone outside, his wife and Frank Fister, in an upstairs bedroom.

The officers then conducted their search, discovering a large quantity of firearms and ammunition in the house, cocaine on the defendant's person and in his wife's purse, and the bags

5

of marijuana in the Tahoe. In addition, in a briefcase on the front seat of the Tahoe was in excess of 100 grams of cocaine, $9000.00 in cash, and a checkbook, credit cards and prescriptions of Fister.

## DISCUSSION

The defendant's contentions can be grouped into two basic divisions: first, the defendant contests the adequacy of the warrant application and, second, challenges the manner of its execution.

### A. The warrant

The defendant makes three distinct claims about the warrant application: (1) that it lacked sufficient support for probable cause to believe that illegal drugs or evidence of drug crime would be present in the defendant's residence, (2) that the application was supported, in part, by illegally intercepted wire communications and (3) that it mis-described the premises as a single family residence when, in fact, it contained two dwelling units.

#### 1. Probable cause

The defendant complains that, while conceding that the affidavit conveyed sufficient information to believe that the defendant was involved in drug transactions, the application was inadequate to support a magistrate's finding of probable cause to believe that controlled substances or evidence of narcotics offenses would be located at the defendant's home. He added in oral argument that if the warrant was to be construed as an "anticipatory warrant," and when police learned that the transaction was not going to take place as originally planned on April 16th in New Hampshire, they should have obtained a new warrant for the 17th. However,

the Commonwealth responds that since the warrant was sought and issued while still expecting the drugs to be delivered by the defendant to the informant in New Hampshire and prior to the defendant's change in plans and that the warrant itself was not sought for drugs, but rather for the instrumentalities and fruits of drug crimes, it was adequately supported and properly issued.

Under Article 14 of the Massachusetts Declaration of Rights, a magistrate must determine that probable cause exists before issuing a search warrant. Commonwealth v. Santana, 411 Mass. 661, 663(1992), Commonwealth v. Upton, 394 Mass. 363, 370 (1985). "'In dealing with probable cause, ... as the very name implies, we deal with probabilities...The substance of all definitions of probable cause is reasonable ground for belief... These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' Draper v. United States, 358 U.S. 307, 313(1959), quoting Brinegar v United States, 338 U.S. 160, 175(1949)." Commonwealth v. Cast, 407 Mass. 891, 895-896(1990). Probable cause exists where "the facts and circumstances within the magistrate's knowledge and of which...[he] had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that the object of the search is probably on the person or premises to be searched at the time the warrant is issued. Commonwealth v. Vynorius, 369 Mass.17,23 (1975).

Where, as here, information from a confidential informant is relied on to supply probable cause to arrest and to search, Art. 14 requires that the affidavit apprize the magistrate of some facts and circumstances showing both (1) the basis of the informant's knowledge, and (2) the credibility of the informant or the reliability of his information. Commonwealth v. Cast, 407

7

Mass. 891, 896(1990), See Aguiar v. Texas, 378 U.S. 108, 114(1964), Spinelli v. United States, 393 U.S. 410, 414-415(1969). While each prong of the Aguiar-Spinelli standard presents a separate inquiry, independent police corroboration of the informant's detailed tip can compensate for deficiencies in either or both prongs of the standard and satisfy the probable cause requirement under Art. 14. Commonwealth v. Cast, supra, Commonwealth v. Upton, supra, at 375-376. Furthermore, the affidavit should be read as a whole, not parsed, severed and subjected to hypercritical analysis. United States v. Ventresca, 380 U. S. 102, 109(1965), Commonwealth v. Ramos, 402 Mass. 209, 213(1988)

Notwithstanding the lack of specificity in this affidavit regarding details of the prior cases in which the informant assisted the New Hampshire State Police, the general conclusory statements of past reliability which led to successful interventions including conviction is sufficient. Commonwealth v. Cacicio, 31 Mass. App. Ct. 943, 945(1991), Commonwealth v. Amral, 407 Mass. 511, 515 (1990).

Moreover, although not precisely on point, the informant's provision of drug samples to the defendant operate much like a controlled buy. "'A controlled purchase of narcotics, supervised by the police, provides probable cause to issue a search warrant.'" Commonwealth v. Warren, 418 Mass. 86, 89, 635 N.E.2d 240 (1994), citing Commonwealth v. Luna, 410 Mass. 131, 134, 571 N.E.2d 603 (1991). Generally, a 'controlled buy' has, at a minimum, these components: (1) a police officer meets the informant at a location other than the location where is it suspected that criminal activity is occurring; (2) the officer searches the informant to ensure the informant has no drugs on his person and (usually) furnishes the informant with money to purchase drugs; (3)

8

the officer escorts or follows the informant to the premises where it is alleged illegal activity is occurring and watches the informant enter and leave those premises; and (4) the informant turns over to the officer the substance the informant has purchased from the residents of the premises under surveillance. See Commonwealth v. Warren, supra, 418 Mass. at 89-90, 635 N.E.2d 240; Commonwealth v. Tshudy, 34 Mass.App.Ct. 955, 956, 615 N.E.2d 583 (1993); Commonwealth v. Benlien, 27 Mass.App.Ct. 834, 838, 544 N.E.2d 865 (1989). See also 1 W.R. LaFave, Search and Seizure § 3.3(f), at 686-687 (2d ed. 1987 & Supp.1994), and the many cases cited therein." Commonwealth v. Desper, 419 Mass. 163, 168 (1994). Here, however, it is the informant who provided narcotics to the defendant, who later reported having tested them to his satisfaction. The informant was under direct supervision of and worked closely with officers. The fact that he was willing to wear a body wire is further evidence of reliability. Commonwealth v. Zuluaga, 43 Mass. App. Ct. 629, 635-636 (1997).

Also, the affiant obtained from a fellow officer (Hambrook), presumptively reliable, (see U.S. v. Ventresca, 380 U.S. 102, 111 (1965)), the results from his interceptions under New Hampshire's one-party consent for eavesdropping, overhearing and recording the defendant in several highly incriminating conversations with the informant, and which led up to the day before, day of (and day after) the issuance of the warrant. These included references by the defendant that he had the ability to test purity of drugs at his home, that he did not use banks and did not show his money, and that, under the original plan, the drugs would first arrive at his house, to be transferred to another vehicle and then driven by him to New Hampshire. In addition, police followed him to his house on at least two separate occasions directly after he had

9

met with the informant in New Hampshire, each time in the company of a purported partner in his drug businesses, who accompanied the defendant into his home following each meeting with the informant. Considering all of the information provided to the magistrate, there was a sufficient basis to conclude that evidence of narcotics crimes would be at the defendant's residence at 9 Wildwood Drive.

**2. Use of wire interceptions**

First, at the hearing of the motion, the defendant conceded that electronic interceptions of the defendant's conversations with the informant, both telephonic and in-person, by means of a body wire and videography, in New Hampshire, by members of the New Hampshire State Police comply with the law of the State of New Hampshire (NHRSA 570-A:2(II)(d)). The defendant challenges the propriety of their use to support a Massachusetts search warrant, given the requirements of G. L. c. 272, §99, primarily seeking the protection of Art. 14 of the Declaration of Rights of the Massachusetts Constitution.

The informant first approached the New Hampshire State Police. Originally, the police operation was going to occur primarily in New Hampshire, with Massachusetts officers providing such assistance as New Hampshire officers needed. All of the recorded interceptions, with the exception of those commencing on April 16, 2002, after the defendant changed plans, and after the warrant was issued, were in connection with supporting the New Hampshire operation. Sgt. Hambrook, by authority granted him under the provisions of New Hampshire law, and with the consent of the informant, listened to all communications between the informant and the defendant contemporaneously and recorded them. The defendant does not challenge the

10

right of New Hampshire police to have done so under New Hampshire law. He does challenge the use of the contents of those intercepted communications in Massachusetts, as they were not obtained as a result of the issuance of a warrant.

Sgt. Hambrook gave a summary of the conversations to his Massachusetts counterpart, Trooper Babbin who, thereafter, listened to a portion of the tapes for purposes of furthering the New Hampshire investigation and by providing assistance to them in Massachusetts by obtaining a search warrant for evidence, fruits and instrumentalities of the drug offenses being investigated in New Hampshire. Only after a rather sudden change in the defendant's plans from a delivery of drugs by him to the informant in New Hampshire on one day to a delivery of those drugs to the informant at the defendant's home in Massachusetts on the next did the plan for a drug intervention by police in New Hampshire change to one for a seizure of drugs to occur in Massachusetts.

The defendant mistakenly relies on the case of Commonwealth v. Eason, 427 Mass. 595 (1998), (after further appellate review had been granted from 43 Mass. App. Ct. 113 (1997), as a basis for a claim that such use is contrary to Art. 14 of the Massachusetts Declaration of Rights, especially as regards the issue that the decision expressly did not address, namely, "if it should develop that a trooper relied on a recording in presenting his testimony, a separate issue would arise on which we intimate no view." at 601. However, it is clear that from a reading of the decision of the Supreme Judicial Court, especially when read in conjunction with Commonwealth v. Gonzalez, 426 Mass. 313 (1997), and Commonwealth v. Cryer, 426 Mass. 562 (1998), that the use of such interceptions in Massachusetts in an application for a search

11

warrant comports with Massachusetts law. First, all of the challenged interceptions herein, pre-warrant, were conducted in New Hampshire by New Hampshire law enforcement officers furthering a New Hampshire investigation. Second, the Massachusetts officers did not listen contemporaneously with the communications and only listened, after the fact, to only a small portion of the recorded conversations while being informed by Sgt. Hambrook of the content of others. Third, in Eason, supra, Massachusetts police were investigating a home invasion that had occurred in Massachusetts and they listened contemporaneously to conversations that occurred in Massachusetts after the home invasion had occurred. The court found that the use, at trial, of conversations between the defendant and another, overheard by police, would be permitted, as such interceptions were not a violation of the protections afforded under Art. 14 nor of G. L.c. 272, §99.

Law enforcement officers are entitled to use their collective knowledge, including from law enforcement activities conducted properly and pursuant to the laws of another jurisdiction, even when such activity would have not been permitted by the law of Massachusetts. Commonwealth v. Gonzalez, 426 Mass. 313, 316-318 (1997). Here, all of the interceptions used by the affiant in support of his application for the warrant were in furtherance of the New Hampshire investigation and at a time when the involvement of Massachusetts officers was minimal. The use of the content of conversations between the defendant and the informant herein is at least one degree removed from the facts in Eason; as such, permitting their use to support a warrant application is all the more compelled. The facts herein present a stronger basis for approval of use of the defendant's statements than those in Eason and, as was noted in Gonzalez, supra, the

facts herein are the mirror image of those in <u>Commonwealth</u> v. <u>Jarabek</u>, 384 Mass. 293 (1981). As was stated in <u>Gonzales</u>, *supra*, "[b]y contrast, the investigation of Thomas, as well as Gonzalez, was initiated by Federal agents. Federal agents made the decision to record the conversations. The purpose of the investigation was to obtain evidence for a Federal prosecution; only the last-minute exercise of prosecutorial discretion kept Thomas and Gonzalez out of Federal court. The motion judge concluded that this was essentially a Federal investigation and that the Lowell police acted under Federal direction and discretion." at 316. Here, "New Hampshire" can just as easily be substituted for "Federal." Suppression is not required.

### 3. Description of place to be searched

The defendant specifically complains that the premises described in the warrant to be searched was not sufficiently and particularly described, since it failed to distinguished between the two residences actually located at 9 Wildwood Drive.

In order to be valid, a warrant must "particularly describe the place to be searched and the persons or things to be seized," as required by the Fourth Amendment to the United States Constitution, art. 14 of the Declaration of Rights of the Massachusetts Constitution, and G.L. c. 276, sec. 2. "The manifest purpose of this particularity requirement was to prevent general searches. By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." <u>Commonwealth v. Carrasco</u>, 405 Mass. 316, 323 (1989), quoting

from Maryland v. Garrison, 480 U.S. at 84.

Here the issue is "whether the description is sufficient to enable the executing officer to locate and identify the premises with reasonable effort, and whether there is any reasonable probability that another premises might be mistakenly searched which is not the one intended to be searched under the search warrant." Commonwealth v. Rugaber, 369 Mass. 765, 768 (1976).

The warrant described the premises to be searched in "Attachment B" to the warrant: "a large wood-framed dwelling in a Tudor style painted creme in color with brown trim. The first level of the residence is constructed of tan brick which forms an archway over the front door. The front door is solid wood and is brown in color. To the right of the front entrance is located a black metal sign with white lettering which reads 'Nine Wildwood Drive'. To the left of the front entrance is a two car enclosed garage. Wildwood Drive is a dead end street and #9 Wildwood Drive is the last residence on the right side of Wildwood Drive."

From all outward appearances, 9 Wildwood Drive is a single-family home and is the residence of the defendant. Indeed, according to records from the Town of Milford Zoning Board of Appeals, the original owner (not the defendant) sought and obtained approval to create a "supplemental apartment" which is one that must be created within the single family residence and which cannot cause an alteration of the single family appearance of the residence. Trooper Babbin ascertained from the Massachusetts Electric Company that there was only one account for electric service at this location and that it was in the defendant's name. There is only one mailbox. The garage to the left of the house as one faces the front of the house is attached to the house by a roof covering an open breeze way. The police surveillance, of which Trpr. Babbin

14

was a part, saw the defendant on several occasions entering and exiting the premises by passing through the breeze way. The entrance to the in-law apartment is off the breeze way, into her kitchen, located toward the rear corner of the house and in a direction that one would walk to get to the stairs leading to the deck and the rear entrance to the defendant's kitchen. Since the appearance of the structure does not reveal the in-law apartment, the only way by which the police would be able to ascertain its existence, without risking a compromise of its investigation, was inspection from within the structure. Given the circumstances, they had no reason to believe that the structure housed two residences, they had no need to perform further investigation and were entitled to rely upon its outward appearance. Commonwealth v. Carrasco, 405 Mass. 316, 324 (1989). As was argued and rejected by the court in Commonwealth v. Burt, 393 Mass. 703 (Mass. 1985), the defendant here "argues that the police officers should have inquired whether the building was a single-family dwelling or a two-family dwelling before obtaining the search warrant. Because the building had all the appearances of a single-family dwelling, and because the police officers were not otherwise put on notice, there was no reason for them to so inquire. Their failure to inquire further was not unreasonable and, indeed, such inquiry could have jeopardized their investigation." at 718.

The instant case is unlike that presented in Commonwealth v. Treadwell, 402 Mass. 355, (1988), wherein the police in execution of a warrant were left to their own discretion in choosing between two differently described apartments on the same floor, one being directly over apartment n. 17 and the other with a certain bumper sticker attached to the door, which turned out to be over apartment n. 16, and that they were unable to independently verify the proper premises

to be searched. Here, they were. Moreover, as soon as they discovered the separate nature of the in-law apartment, they broke off this entry, except to check for the presence of the target subjects, and focused their attention on the remainder of the premises. This case more closely resembles the facts in Commonwealth v. Demogenes, 14 Mass. App. Ct. 577 (1982). See also Commonwealth v. LaPlante, 416 Mass. 433 (1993), Commonwealth v. Burt, *supra*, and Commonwealth v. Luna, 410 Mass. 131 (1991), in which it was stated that "the burden was on the defendants, in challenging the seizure of evidence pursuant to a search warrant, to show that the police reasonably should have known that there were two separate apartments in what appeared to be a single-family house." At 137. Here, the defendant has not shown that the police should reasonably have known of the existence of his mother-in-law's apartment.

Additionally, "[b]ecause the affiant was the same person who executed the warrant, there was no reasonable probability that another premises might be mistakenly searched." Commonwealth v. Gonzalez, 39 Mass. App. Ct. 472, 477 (1995). It was Trooper Babbin, the affiant, who led the entry into the in-law apartment. As soon as he entered, he recognized the separate nature of the apartment and the intrusion was broken off as soon as it was secure from targeted individuals. There is no reason to suppress the ultimate results of their search of the premises from their limited entry into this apartment as the officers had no reason to know of its existence.

B. **The execution of the warrant**

The defendant's claims with respect to the manner in which the warrant was executed fall into two areas: failure to observe the knock and announce rule and that the search impermissibly exceeded the scope of the warrant by a search of persons present and of the vehicle driven to the

premises by the co-defendant Fister.

1. **The knock and announce rule**

The defendant contends that the police failed to knock and announce their presence prior to entry and, being unauthorized by the warrant to make an unannounced entry, the fruits of their search must be suppressed. He bases this contention on evidence obtained from his 74 year old mother-in-law who testified that when police made their first entry into this building, she heard neither a knock nor any announcement of their office. However, her testimony is not credited. Trooper Babbin was one of the first officers to make entry. He knocked and yelled "state police-search warrant" several times, waited an appropriate interval prior to entry, and entered. I find that he and Sgt. Hambrook testified credibly concerning their observance of the knock and announce requirements. Certainly when police were observed on the deck while the defendant and Fister were in the kitchen, the defendant's actions showed that he had no further need of their announcement. There was no violation of the knock and announce rule.

2. **The search of the motor vehicle and persons present**

   a. **The motor vehicle search**

The defendant claims that the search of the motor vehicle exceeded the proper scope of the warrant, as it was not identified in the warrant. However, such a claim ignores the motor vehicle exception to the warrant requirement, permitting the officers to search the motor vehicle, inherently mobile, upon the existence of probable cause. Commonwealth v. Motta, 424 Mass. 117, 122 (1997). Even if located on private property, police could not be sure that a confederate would not drive off with the vehicle. Although I find that the information provided to police by

the informant, after being shown the marijuana by the defendant in the rear of the vehicle, was sufficient to establish probable cause; even if it were not, when considered together with police observations of the bags in the back of the Tahoe and the strong odor emanating therefrom, police were provided probable cause. Once probable cause is established for a search of the vehicle, it attaches for a search of any containers therein that may conceal the object of the search, such as the briefcase, herein, sitting on the front seat. Commonwealth v. Cast, 407 Mass. 891, 906-908 (1990), Commonwealth v. Moses, 408 Mass. 136, 145 (1990).

Moreover, even if the search of the motor vehicle and seizure of the bags of marijuana could not be sustained pursuant to the motor vehicle exception to the warrant requirement, the placement of the vehicle up against the garage, attached to the house, clearly an area within the control of the defendant, and the police observations of the defendant acting with respect to the vehicle, opening the rear doors to show the contents to the informant, brings it within the curtilege of the house, thus coming within the proper scope of the warrant. I infer that the defendant had Fister turn the vehicle around and back it up against the garage to make the contents less visible from the street. "It is clear that a valid search may include any area, place, or container reasonably capable of containing the object of the search. Commonwealth v. Signorine, 404 Mass. 400, 405 (1989), citing Commonwealth v. Wills, 398 Mass. 768, 774 (1986) and Commonwealth v. Lett, 393 Mass. 141, 147-148 (1984). The defendant has exhibited control over the vehicle, the area in which it was located and it was situated so as to take full advantage, apparently for privacy sake, of its proximity to the structure.

### b. Search of Debra Cavaliere's purse

The defendant contends that the scope of the warrant, specifically excluding authority to search all persons present, was exceeded by police when they searched the purse of the defendant's wife. This occurred after some weapons were found in the home. Debra Cavaliere volunteered to the officers that she had a permit for the weapons, located in her purse, which was then located on an item of furniture. Before they allowed her to go into her purse, officers searched it looking for additional weapons. Money and additional contraband was found. Police had the right to search containers within the home in which could be found items subject to the warrant, as well as the right to take reasonable measures for their safety. Her person was not searched.

### c. Search of Frank Fister

Fister had run upstairs upon seeing police on the rear deck. By this point in time, police had learned that he had driven the Tahoe onto the property and it was filled with bags of marijuana. They had probable cause to arrest him. A search of his person was permitted as incident to lawful arrest.

## C. Conclusion

Consequently, the issuance and execution of the warrant was proper.

## ORDER ON MOTION

For the foregoing reasons, the defendant's motion to suppress evidence is denied.

Francis R. Fecteau
Justice of the Superior Court