COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                                                                                       SUPERIOR COURT
APPLICATION AND AFFIDAVIT IN SUPPORT OF APPLICATION
FOR SEARCH WARRANT
GO. c. 276, sec. One to A, St. 1964, c. 557

I, Timothy G. Babbin, being duly sworn, depose and say:

1. I am a Trooper with the Massachusetts State Police, currently assigned to the Office of the Attorney General, Narcotics and Special Investigations Division. I have been a State Police Officer for nine years. During the past nine years, I have made more than 400 arrests, ranging in all areas of crime against persons and property. I have received specialized training in narcotics recognition, identification and investigation. This specialized training includes: The Narcotics Training School offered by the Drug Enforcement Administration, The Narcotics Interdiction course at the Massachusetts State Police Academy as well as an Undercover School offered by the Bureau of Alcohol, Tobacco and Firearms. As a result of these courses, coupled with my experience, I am familiar with the appearance, packaging, texture, and smell of many controlled substances. During my career, I have made numerous narcotics trafficking arrests for cocaine, heroin, marijuana and other controlled substances. I have testified in Superior Courts within the Commonwealth in the prosecution of multiple drug trafficking cases. Since my assignment to the Narcotics and Special Investigations Division, I have participated in numerous undercover narcotics purchases, covert surveillance of target subjects, and other associated undercover investigative operations. I have further participated in numerous multi-agency investigations involving the following agencies: The Federal Bureau of Investigation, The Drug Enforcement Administration, The United States Customs Service, The United States Secret Service and The United States Immigration and Naturalization Service.

These investigations included narcotics trafficking, organized crime (RICO), money laundering, and counterfeiting.

2.  In the course of my official duties as a State Police officer, I have interrogated many defendants, informants and suspects who were users, sellers and distributors of controlled substances and I have participated in authorized electronic interception of conversations between such persons. On the basis of my training and experience, I am familiar with the vernacular of illegal narcotics abusers and distributors. I am further familiar with the methods by which such persons seek to disguise the subject of their conversations and operations, as well as the full range of methods, practices and techniques by which members of such organized criminal conspiracies illicitly transport and distribute controlled substances.

3.  In early November 2001, I was contacted by Sergeant Michael Hambrook of the New Hampshire State Police regarding an ongoing New Hampshire State Police Narcotics investigation. I have known Sergeant Hambrook for more than six years and I know him to be a seasoned narcotics investigator with substantial experience in all areas of narcotics investigations. Sergeant Hambrook is the supervisor for the statewide narcotics investigation unit for the New Hampshire State Police. Sergeant Hambrook advised that he had been contacted by a confidential and reliable informant (from herein "CI") regarding a possible marijuana and/or cocaine reverse sting operation. A reverse sting operation is an operation in which undercover police officers or their agents portray narcotics distributors to large scale purchasers of narcotics. Undercover negotiations are made to complete a large scale narcotics transaction and upon its completion target subjects would be apprehended. I have participated in

several reverse sting operations as both an investigator and an undercover officer. Sergeant Hambrook advises that he has used information provided by CI on numerous occasions in the past and this information has resulted in numerous arrests and convictions in State and Federal Courts in New Hampshire for narcotics trafficking, money laundering and bank robbery. Sergeant Hambrook further advised that CI has testified in these cases and would be willing to testify to matters outlined in this affidavit. CI's true identity is known to Sergeant Hambrook and his supervisor in the New Hampshire State Police Narcotics Unit.

4.  Sergeant Hambrook advises that CI has been in contact with a subject from Massachusetts regarding a substantial purchase of marijuana and/or cocaine. This subject has been identified as CAVALIERE, Ronald J, 05/13/48, SS# 27385582, of 9 Wildwood Drive in Milford, Massachusetts. This officer has conducted checks with the Interstate Identification Index and those checks reveal that CAVALIERE, Ronald J 05/13/48 has a prior 1979 Federal conviction for Conspiracy to Distribute Cocaine. CAVALIERE received a two year suspended sentence with an additional two years probation and a special parole term of three years. I have obtained photo images from the Massachusetts Registry of Motor Vehicles and made the aforementioned identification. CI and CAVALIERE have discussed the aforementioned large scale purchase of marijuana and/or cocaine. CAVALIERE has expressed his desire to purchase a quantity of 500 (five-hundred) pounds of marijuana. CAVALIERE has further expressed his desire to purchase 20 (twenty) kilograms of cocaine. Through this officer's training and experience, I am aware that the value of this combined sale of narcotics would be nearly $1,000,000 (one million) dollars. Sergeant Hambrook advised that the telephone contact negotiating the narcotics transaction between CI and CAVALIERE has taken place on two

different telephone numbers. Sergeant Hambrook conducted checks with Verizon telephone records which revealed that the first number, 508-478-5876 is listed to D. Cavaliere 9 Wildwood Drive, Milford, Massachusetts. This officer conducted checks with Mass Electric Security for electrical service at 9 Wildwood Drive, Milford, Massachusetts. Mass Electric Security advises that electrical service at 9 Wildwood Drive is subscribed to by CAVALIERE, Ronald since August of 1993. MASS Electric Security shows the same contact telephone number of 508-478-5876 for 9 Wildwood Drive, Milford, Massachusetts. A second telephone number, 508-344-1930 was provided by CAVALIERE to CI in furtherance of the aforementioned narcotics transactions. Subpoenas to Cingular Wireless on this number have not been returned as of this date.

5.      On Monday, November 12, 2001 this officer along with other officers assigned to this investigation along with Troopers of the New Hampshire State Police Narcotics Unit had assembled in anticipation of a meeting between CI and CAVALIERE. The purpose of this meeting was to have CI provide CAVALIERE with a sample of marijuana. This sample was provided in furtherance of the aforementioned reverse sting operation. The providing of the sample is in keeping with the lawful procedures associated with a reverse sting operation in Massachusetts. Sergeant Hambrook has advised me that the providing of such a sample in a reverse sting operation is also in keeping with New Hampshire law and procedures associated with a reverse sting. Surveillance had been established on CI and its vehicle. A black BMW MA REG# 8088EA arrived at the predetermined meet location in Louden, New Hampshire. MA REG# 8088EA is assigned to a 1994 BMW 530I and registered to a ROBERTS, Arnold P , 07/28/49, SS# 019386910, of 24 Pine Plain in Wellesley, Massachusetts. The driver was

subsequently identified by Sergeant Robert Quinn of the New Hampshire State Police from Registry of Motor Vehicle photo images as ROBERTS. CAVALIERE was seated in the passenger seat. CAVALIERE and ROBERTS exited the BMW and entered CI's undercover vehicle. The conversations taking place in CI's undercover vehicle were audio and video taped in accordance with New Hampshire law. CI and CAVALIERE discussed the quality of the marijuana and CAVALIERE stated that it would have to be smoked to determine its quality. CAVALIERE further stated that his people would take five-hundred (500) pounds of marijuana in the first transaction. During these conversations CAVALIERE stated that he had a trucking company to facilitate transportation of the marijuana. CAVALIERE added that if the price was right "I can get rid of anything." CAVALIERE also spoke of a different group of associates who were in the cocaine business. CAVALIERE stated that this organization was capable of moving between twenty and fifty kilograms of cocaine per month. CAVALIERE added that he had seen persons in this organization move as many as six kilograms of cocaine in a single day. CAVALIERE further stated that although he had access to large quantities of marijuana, he was still interested in a large purchase of marijuana from CI. During this meeting, CAVALIERE referred to ROBERTS as "Paul". CAVALIERE, ROBERTS and CI discussed the proposed marijuana transaction and the logistics of setting up same. These plans were to ostensibly include CI providing a truck with the marijuana which, following payment by CAVALIERE and/or others, could be left at a predetermined location and secured pending pick up at a later date. Following this meeting with CI, CAVALIERE and ROBERTS returned to the black BMW and were surveilled as it returned to Route 93 southbound into Massachusetts. CI advised Sergeant Hambrook that it had provided the sample of marijuana to CAVALIERE as previously arranged. CI further advised that CAVALIERE stated he would be showing the sample to his

partners and would advise if the narcotics transaction would take place. Taped recordings were made of this meeting, as well as several previous telephone calls leading up to this meeting, between CAVALIERE and CI. These recordings were made in accordance with New Hampshire law. Surveillance units followed CAVALIERE and ROBERTS directly from Louden, New Hampshire to CAVALIERE's residence at 9 Wildwood Drive in the town of Milford, Massachusetts. CAVALIERE and ROBERTS exited the black BMW and entered the residence. A short time later, CAVALIERE and ROBERTS returned to the vehicle and traveled directly to the Pago Pago Chinese restaurant on Route 16 in the town of Milford. CAVALIERE and ROBERTS exited the black BMW and entered the restaurant and took a seat in a booth. Sergeant Robert Quinn and Trooper Cheryl Nedeau of the New Hampshire State Police took a seat in an adjacent booth. A short time later a green Cadillac Catera, MA REG# 238NKY arrived at the restaurant. The operator, subsequently identified by Registry of Motor Vehicle photo images, as KALLAS, Nicholas, 11/19/55, SS# 014483572, of 20 Summer Street in the town of Acton, entered the restaurant and joined ROBERTS and CAVALIERE at their booth in the restaurant. I have spoken with Sergeant Quinn who advised that CAVALIERE, ROBERTS and KALLAS were discussing the purchase of the marijuana. Sergeant Quinn stated that CAVALIERE said "There is nothing around." Sergeant Quinn advises that he believes, based on his training and experience in narcotics investigations, this statement to mean that there is little marijuana available for sale in the area. Sergeant Quinn continued to overhear the conversation between CAVALIERE, ROBERTS and KALLAS. A short time later, the meeting broke up. ROBERTS left in the BMW and CAVALIERE and KALLAS exited the restaurant and drove in KALLAS' vehicle directly to CAVALIERE's residence at 9 Wildwood Drive in Milford.

6.      During the months of December and January, CI maintained telephonic contact with CAVALIERE regarding the possible marijuana sale as well as a possible large scale cocaine transaction. Sergeant Hambrook was a party to these conversations by means of a three way call. Sergeant Hambrook then related the substance of these conversations to me. These conversations were taped in accordance with New Hampshire law.

7.      On Tuesday, February 19, 2002 this officer was again contacted by Sergeant Hambrook, who advised that CI was making arrangements to meet with CAVALIERE on Wednesday, February 20, 2002. Several of these calls were taped in accordance with New Hampshire law. The purpose of this meeting was ostensibly to have CI provide CAVALIERE with a sample of cocaine as a precursor to a large cocaine transaction. Disbursement of such a sample during a reverse sting is lawful and in keeping with both Massachusetts and New Hampshire law. Sergeant Hambrook advised that this meeting was to take place in the Manchester, New Hampshire. On Wednesday, February 20, 2002 this officer along with other officers assigned to this investigation had assembled in the Manchester, New Hampshire area in anticipation of the meeting between CAVALIERE and CI. At approximately 1330 hours, CI had arrived at the predetermined meeting location of the parking lot at the Longhorn Restaurant on Route 28 in Manchester, New Hampshire. Video and audio surveillance of the meeting was conducted in keeping with New Hampshire law. Shortly after CI arrived at the restaurant, CAVALIERE exited the Longhorn restaurant and entered CI's vehicle. Once inside CI's vehicle, CI and CAVALIERE began a conversation concerning CAVALIERE's marijuana business. CI and CAVALIERE also discussed the proposed 25 kilogram cocaine transaction. CI provided CAVALIERE with a sample of cocaine. CAVALIERE stated, "You have to be careful, this is the

stuff you do time for". CI also provided CAVALIERE with a marijuana sample. CAVALIERE indicated that he and his partner(s) would test the quality of the cocaine and advise CI as to the order. CAVALIERE further stated that he had a method of testing the cocaine, at his residence, that would reveal its purity. At one point, CAVALIERE tasted the cocaine sample and stated "There is milk sugar in this." In this officer's training and experience, lactose (milk sugar) is a common diluent used by cocaine distributors to further their product. Further, it is this officer's belief that this test reveals CAVALIERE's level of expertise in narcotics in that he is able to identify a particular diluent by means of a taste test. CAVALIERE added that he had a "cooker" and this device heated cocaine to two- hundred degrees and would separate the pure cocaine from any diluents. CAVALIERE stated that he had been in the drug trade for some thirty years and the reason for his success in the narcotics trade was that "I've done it right". CAVALIERE advised CI that he recently had taken delivery in Massachusetts of 1000 pounds of marijuana. CAVALIERE explained that the marijuana was moved from Colorado to Texas where associates of CAVALIERE's obtained the marijuana and transported it to Massachusetts. CAVALIERE went on to say that he had paid three-hundred dollars ($300.00) per pound for the marijuana in Colorado and sold it for seven-hundred dollars ($700.00) per pound in Massachusetts. CAVALIERE and CI discussed delivery and payment for the twenty-five kilogram cocaine transaction. CI and CAVALIERE discussed possibly conducting a transaction for both cocaine and marijuana. CAVALIERE stated that his customers for the cocaine and marijuana were two different people. CAVALIERE stated " I don't like driving around with three-hundred-thousand ($300,000.00) in cash." CAVALIERE further cautioned CI stating "The worst thing you can do is go to a hotel. That's how everybody gets popped . That's where the drug deals go down....hotel rooms......Cops know this." At the end of this conversation, CI asked

about "Paul" (ROBERTS). CAVALIERE stated that "Paul" had approximately one million dollars. When CI stated that was a large amount of money, CAVALIERE stated that was not a lot of money today and further that his residence alone was worth a million dollars. During a conversation concerning an automobile/motorcycle dealership, which CAVALIERE was allegedly opening in the Spring of 2002, CAVALIERE added that he could not "show his money" and that he "didn't put his money in the bank". CAVALIERE and CI briefly discussed CAVALIERE's current venture of opening up an auto dealership and some associated financial plans. CAVALIERE added that he had recently acquired the Ducati motorcycle franchise for this dealership. CAVALIERE advised that he would contact CI later this date and advise as to the results of the quality test of the cocaine sample. This conversation and meeting were audio and video taped inside CI's undercover vehicle. Following the meeting, CAVALIERE exited CI's undercover vehicle and returned to the Longhorn Restaurant. CI met with Sergeant Hambrook and advised him that he had provided CAVALIERE with the cocaine and marijuana samples as previously arranged. A short time later CAVALIERE exited the restaurant along with KALLAS, Nicholas 11/19/55. CAVALIERE and KALLAS walked from the restaurant and entered KALLAS' vehicle, a green Cadillac Catera MA REG# 238NKY. It should be noted that this is the same vehicle that KALLAS was operating during the meeting between CAVALIERE, KALLAS and ROBERTS at the Pago-Pago Restaurant in Milford following the meeting in November where CAVALIERE and ROBERTS obtained the marijuana sample from CI in Louden, New Hampshire. This officer along with other surveillance units then followed KALLAS and CAVALIERE directly from the meeting in Manchester, New Hampshire to CAVALIERE's residence at 9 Wildwood Drive in the town of Milford where the garage door was opened and CAVALIERE and KALLAS entered the residence. Later this date,

CAVALIERE contacted CI and advised that he was pleased with the quality of the sample and wished to proceed with the 25 kilogram purchase. CAVALIERE advised CI to contact him on Monday, February 25, 2002 to make final arrangements for the cocaine transaction.

8.  CI and CAVALIERE maintained telephonic contact during late February and March 2002. These conversations were recorded by Sergeant Hambrook in accordance with New Hampshire law. During this time, CAVALIERE maintained that he was unable to secure the large quantity of currency ($300,000.00) to complete the twenty-five kilogram cocaine transaction. On Friday, April 12, 2002 CI placed a call to CAVALIERE's cellular telephone. CI and CAVALIERE discusssed a three hundred pound marijuana purchase. CAVALERE stated to CI that "his guy " would have three hundred pounds of marijuana available on Monday, April 15, 2002. CI and CAVALIERE discussed prices for the marijuana. CAVALIERE stated that his associate would charge seven-hundred dollars per pound. CAVALIERE stated that he wanted to make fifty dollars per pound for himself and that the final price to CI would be seven-hundred and fifty dollars per pound. CAVALIERE further stated that he would provide CI with a sample of this marijuana on this date (Monday, April 15, 2002) and the deal could be completed later the same day or the following day.

9.  On Monday, April 15, 2002, this officer and other officers assigned to this this investigation had established a surveillance of CAVALIERE's residence at 9 Wildwood Drive in anticipation of the meeting with the CI later this date. CI placed a call to CAVALIERE's residence and CAVALIERE's wife advised CI to call CAVALIERE on the cellular telephone. At approximately 11:00 a.m. this date, CI called CAVALIERE on his cellular telephone and the

two discussed a meeting later that date. CAVALIERE stated that he was on the golf course but would still be able to bring the sample. CAVALIERE stated that he had the sample of marijuana in his possesion to give to CI. CAVALIERE further stated that "his guy" had the three hundred pounds and was ready to conduct the transaction. CI and CAVALIERE spoke several times on CAVALIERE's cellular telephone during the afternoon. At approximately 2:30 p.m., CAVALIERE stated that he had hurt his back on the golf course and was on his way back to the residence. Later in this converstaion, CAVALIERE and CI agreed to forego the delivery of the sample and made arrangements for CAVALIERE and an as yet unknown associate to deliver the three hundred pounds of marijuana to New Hampshire. At approximately 7:40 p.m., CI again spoke with CAVALIERE concerning the marijuana delivery on TuesdayApril 16, 2002. CAVALIERE stated that he had sampled some of the marijuana and that it was of very high quality. CAVALIERE added that CI would be able to get an additional fifty dollars per pound from his customers. CAVALIERE further stated that his associate would be working until 3:00 p.m. and would then load the marijauna, travel to CAVALIERE's residence where the marijuana would be loaded into CAVALIERE's truck and the two would then meet with CI at an as yet undecided Plaistow, New Hampshire location. CAVALIERE then advised CI to contact him at 3:00 p.m on this date to finalize the delivery location.

## GENERAL OPINIONS

In my training and experience, I have learned the following:

A.   Drug distribution is sometimes conducted as a cash and carry business, and at other times,

drugs are bought and sold on credit. In either event, the distribution of drugs is a cash business, and distributors of drugs often deal in large sums of money. This necessitates that the distributor be in the possession of, or have ready access to, large amounts of money.

B. Because drugs are often bought and sold on credit, distributors frequently maintain written records of the drugs bought and sold, the identities of the persons who have purchased or sold the drugs, and the monies due to, or owed by, them.

C. Distributors of drugs often maintain books, records, receipts, invoices, notes, ledgers, money orders, bank records and other papers relating to their transportation, ordering, sale and distribution of controlled substances.

D. Persons involved in the distribution of controlled substances often secrete their distribution records, controlled substances and money, on their person, in their residences, in the residences of persons involved with them in the distribution of controlled substances, and in bank safe deposit boxes and other secure storage areas to which they have access. This is done for several reasons. First, safe deposit boxes, secure storage areas, and hidden areas of residences and businesses are thought to provide a high degree of security for the record, drugs and proceeds of their drug distribution activities. Second, by secreting these items in secure areas, such as safe deposit boxes and hidden locations within their residences, drug distributors hope to minimize the likelihood that these items will be discovered by law enforcement officers who may execute search warrants at their

12

offices, businesses or homes. Third, federal currency transaction reporting laws require financial institutions and businesses to report to the federal government cash transactions in excess of $10,000. Because individuals participating in drug distribution activities often deal in cash transactions greater than $10,000, they often store their monies in safe deposit boxes and other secure areas, such as hidden locations within their residences and businesses, to avoid the transactions being reported to the federal government.

E.  Drug distributors may hide their monies, rather than investing in bank accounts or other investment vehicles, for other reasons as well. For example, distributors of drugs often do not report their distribution income to the Internal Revenue Service and Department of Revenue, and by secreting their distribution monies in safe deposit boxes (or in other secure storage locations), they attempt to minimize the likelihood of detection by these agencies. Also, drug distributors often are familiar with the drug forfeiture laws, and attempt to conceal from law enforcement those assets which are used to facilitate their drug distribution activities. As such, monies, as well as ownership records for other assets such as vehicles and real estate, are often secreted in secure storage areas such as a safe deposit boxes.

F.  Drug distributors often employ stratagem to conceal the fact that their money, and assets acquired with their money, are traceable to the distribution of drugs. One common method of disguising the source of drug money is to "launder" it through what appears to be a legitimate business. Drug distributors often associate themselves with cash

13

businesses, or persons involved in cash businesses, and falsely attribute their drug monies and income to the cash business. This tends to establish a lawful source for the money, thereby insulating the drug dealer and his money and assets, from detection by law enforcement officers.

G. Other methods of "laundering" drug money exist. For example, drug dealers sometimes create documents and accounts making it appear as if the dealer has borrowed money. The dealer can then attribute his money to the non-existent loan, disguising its true source. A drug dealer may also make it appear that a family member, or other associate loaned him the money, so that he can make regular payments to this family member or associate. Although these payments are attributable to the distribution of drugs, the dealer creates documents and records making it appear as if they are payments of principal and interest on the loan.

H. Whatever method of "laundering" money that a drug distributor employs, it allows him to invest his drug money in bank accounts, certificate of deposits, securities, business ventures, and other investment vehicles, with some degree of confidence that the true source of the money will not be detected.

REQUEST FOR SEARCH WARRANT FOR 9 WILDWOOD DRIVE,
MILFORD, MASSACHUSETTS

10.    Based upon the foregoing, I have probable cause to believe that the subjects residing at 9 Wildwood Drive, Milford, Massachusetts are engaged in an ongoing and continuous enterprise of narcotics distribution and that evidence of such illegal activity will be found at 9 Wildwood Drive, Milford, Massachusetts.

11.    The property for which I seek issuance of a search warrant is found in the following ADDENDUM "A":

### ADDENDUM "A"

I.    Books, papers, documents, ledgers, records, accounts, evidencing the possession and/or distribution of Marijuana and/or Cocaine , including, but not limited to, records and other papers reflecting 1) the purchase or acquisition of Marijuana and/or Cocaine, 2) the identities of the sources of Marijuana and/or Cocaine, 3) the storage of Marijuana and/or Cocaine, 4) the distribution of Marijuana and/or Cocaine, 5) the identities of persons to whom Marijuana and/or Cocaine was distributed;

II.    Books, papers, documents, ledgers, records, accounts evidencing the sources of money or other property used to purchase or acquire Marijuana and/or Cocaine and/or the manner in which the financial proceeds of the distribution of Marijuana are stored, invested or spent, including, but not limited to, 1) amounts of money paid, collected or owed on account of the purchase or

sale of Marijuana, 2) bank records, 3) investment account records, 4) safe deposit box rental agreements or keys, 5) property deeds, 6) bills of sale, 7) tax returns, 8) vehicle titles, 9) business records;

III.  United States currency or coins used to purchase or sell Marijuana and/or Cocaine, or traceable to the purchase or sale of Marijuana and/or Cocaine ;

IV.  Scales, packaging materials and paraphernalia used in the possession or distribution of Marijuana and/or Cocaine ;

V.  Papers and possession identifying the person(s) having custody and control over the premises being searched, and its contents;

12. Wherefore, I respectfully request that the court issue a warrant and order of seizure, authorizing the search of 9 Wildwood Drive, Milford, Massachusetts. The residence is more particularly described below in Addendum "B"

## ADDENDUM "B"

The property at 9 Wildwood Drive, Milford Massachusetts is more particularly described as a large wood-framed dwelling in a Tudor style painted cream in color with brown

trim. The first level of the residence is constructed of tan brick which forms an archway over the front door. The front door is solid wood and is brown in color. To the right of the front entrance is located a black metal sign with white lettering which reads " Nine Wildwood Drive". To the left of the front entrance is a two car enclosed garage. Wildwood Drive is a dead end street and #9 Wildwood Drive is the last residence on the right side of Wildwood Drive.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 16 TH DAY OF APRIL 2002

_____

Timothy G. Babbin, #2120
Trooper, Massachusetts State Police
Office of the Attorney General
Criminal Division
Division of Narcotics and Special Investigations

Then, personally appeared before me the above named Timothy G. Babbin and made oath that the foregoing affidavit by him is true, on this 16 th day of April 2002.

Before me,

Associate Justice

Superior Court

ADDENDUM "A"

I.   Books, papers, documents, ledgers, records, accounts, evidencing the possession and/or distribution of Marijuana and/or Cocaine, including, but not limited to, records and other papers reflecting 1) the purchase or acquisition of Marijuana and/or Cocaine, 2) the identities of the sources of Marijuana and/or Cocaine, 3) the storage of Marijuana and/or Cocaine, 4) the distribution of Marijuana and/or Cocaine, 5) the identities of persons to whom Marijuana and/or Cocaine was distributed;

II.   Books, papers, documents, ledgers, records, accounts evidencing the sources of money or other property used to purchase or acquire Marijuana and/or Cocaine and/or the manner in which the financial proceeds of the distribution of Marijuana are stored, invested or spent, including, but not limited to, 1) amounts of money paid, collected or owed on account of the purchase or sale of Marijuana, 2) bank records, 3) investment account records, 4) safe deposit box rental agreements or keys, 5) property deeds, 6) bills of sale, 7) tax returns, 8) vehicle titles, 9) business records;

III.   United States currency or coins used to purchase or sell Marijuana and/or Cocaine, or traceable to the purchase or sale of Marijuana and/or Cocaine;

IV.   Scales, packaging materials and paraphernalia used in the possession or distribution of Marijuana and/or Cocaine;

V.   Papers and possession identifying the person(s) having custody and control over the premises being searched, and its contents;

## ADDENDUM "B"

The property at 9 Wildwood Drive, Milford Massachusetts is more particularly described as a large wood-framed dwelling in a Tudor style painted cream in color with brown trim. The first level of the residence is constructed of tan brick which forms an archway over the front door. The front door is solid wood and is brown in color. To the right of the front entrance is located a black metal sign with white lettering which reads " Nine Wildwood Drive". To the left of the front entrance is a two car enclosed garage. Wildwood Drive is a dead end street and #9 Wildwood Drive is the last residence on the right side of Wildwood Drive.